Filed 8/21/15  In re Christian P. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re CHRISTIAN P. et al., Persons Coming Under the Juvenile Court Law. | |
| | D067855 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1107A-B) |
| v. | |
| ABIGAIL G., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Emily Uhre, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Abigail G. (Mother) appeals the judgment terminating her parental rights over Christian P. and M.P. (together, the children).  First, Mother contends the court erred by denying her Welfare and Institutions Code section 388[1] petition to modify an order terminating her reunification services.  Second, Mother contends the court erred by declining to apply the beneficial relationship exception to termination of parental rights and adoption under section 366.26, subdivision (c)(1)(B)(i).  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In November 2012, the San Diego County Health and Human Services Agency (the Agency) filed dependency petitions on behalf of one-year-old Christian and one-month-old M.P.  As to Christian, the Agency alleged he faced a substantial risk of abuse or neglect based on the severe physical abuse inflicted on his sibling, M.P., by their father (Father).  (§ 300, subd. (j).)  As to M.P., the Agency alleged she was a child under five who had suffered severe physical abuse, knowingly inflicted by Father.  (§ 300, subd. (e).)  M.P. had been discovered with extensive bruises on different body parts, hemorrhaging in the face and head from pressure and possible strangulation, significant abdominal trauma, elevated liver enzymes, a possible rib fracture, and scars.  Father was arrested, imprisoned, and ultimately convicted of child cruelty.

---

[1]     All further statutory references are to the Welfare and Institutions Code.

2

The Agency's reports reflected that Mother and Father were both 18 years old, unmarried, and had been in a volatile relationship for two years. Neither had graduated from high school. When she was 15, Mother smoked marijuana (about 10 times a day) and drank alcohol. During her pregnancies with Christian and M.P., Mother moved back and forth multiple times between her parents' home and the paternal grandparents' home. Due to parental disapproval over her unplanned pregnancies, Mother suffered from depression, a condition she would struggle with for years.

Before and during Mother's relationship with Father, he was physically violent, had angry outbursts, violated parole, abused drugs, drank alcohol, and experienced mental health problems. After M.P.'s physical abuse was discovered, a criminal protective order prevented Father from having any contact with M.P. until 2016. Mother was completely shocked that M.P. had suffered severe physical abuse. Mother did not recognize the signs of abuse, and she did not believe Father would intentionally hurt M.P.

In February 2013, the court sustained the Agency's petitions, declared the children to be dependents, and ordered them to be placed in the care of relatives. Thereafter, the children resided with their paternal aunt and uncle, F.T. and A.T. (together, Relatives). The court ordered reunification services for Mother and Father, including child abuse classes and therapy. Mother initially delayed attending her child abuse classes and eventually made slow progress. At the six-month review hearing, the court found that returning the children to Mother and Father would be detrimental and reunification services had been reasonable and ordered six more months of services for them.

Despite acknowledging that her relationship with Father was destructive and harmful to the children, Mother deceived those around her and continued seeing him. For a few months, Mother's unsupervised visits with the children were revoked after she and Father had a violent physical confrontation and she had allowed M.P. to have unauthorized contact with Father. Mother also had several violent arguments with Father over the phone.

In 2014, Mother found out she was pregnant again with Father's child, became severely depressed and withdrawn, and left her job. She threatened to abort her unborn child if Father left her and required prompting to seek prenatal care. She stopped visiting the children for several weeks and stopped attending her individual therapy sessions for several months. Father, who had not yet begun his therapy or child abuse classes, was still using drugs and was arrested for possession of crystal methamphetamine. At the 12-month review hearing, the court terminated reunification services for Father. Although the court expressed extreme concern with Mother's failure to participate in services, it ordered six more months of reunification services for her, stating that Mother must immediately change her behavior. The court further found that the services provided so far had been reasonable and ordered the children to remain placed in relative care.

After Father was imprisoned, Mother began making a little more progress in her child abuse classes and therapy sessions, but one therapist stated that Mother showed signs of being in an abusive or controlling relationship. Another therapist stated that Mother still had strong feelings for Father. Mother was visiting and communicating with Father while he was in prison. With respect to the children, Mother would visit them, but

4

she had trouble disciplining Christian. Also, Mother was not consistently involved with the children's care; at one point she was unaware that M.P. had been sick with a high fever for four days. After a contested 18-month review hearing, the juvenile court terminated reunification services for Mother, finding that she had failed to participate regularly and make substantive progress in a court-ordered treatment plan. She had not fully completed her 52-week child abuse program.

Subsequently, Mother completed her child abuse program and gave birth to a healthy baby. She stopped attending her individual therapy sessions for several months to concentrate on her newborn baby, and then restarted. Mother was regularly visiting the children about three times a week for several hours at a time and, during these visits, she generally demonstrated appropriate parenting skills. Nevertheless, the children identified Relatives as their "family" and primary caregivers. For nearly two years, the children had been thriving under the care of Relatives, who were employed, stable, and had raised two teenage daughters. Relatives loved the children, were committed to adopting and raising them, and were meeting the children's daily physical and emotional needs.

In January 2015, Mother filed a section 388 petition to modify the court's order terminating her reunification services and obtain custody of the children. A month later, the court held contested section 388 and section 366.26 hearings. After considering witness testimony, documents, and arguments of counsel, the court found that Mother had not met her burden of demonstrating changed circumstances or that placement of the children with her was in their best interests. Furthermore, the court found that the

children were likely to be adopted and no statutory exception applied to termination of parental rights. The court terminated Mother's and Father's parental rights.

DISCUSSION

I

*The Juvenile Court Did Not Err in Denying the Section 388 Petition*

A.    Applicable Law

Under section 388, a parent may petition the court to change, modify, or set aside a previously made court order. The petitioning party has the burden of showing, by a preponderance of the evidence, that (1) there is a change of circumstances or new evidence and (2) the proposed change is in the child's best interests. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.) To support a section 388 petition, the change in circumstances must be substantial. (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)

When determining whether a proposed section 388 modification is in the child's best interests, the court considers a number of factors, including the seriousness of the problem leading to the dependency, the reason the problem continued, the strength of the parent-child and child-caretaker bonds, the time the child has been in the system, the

nature of the change of circumstance, the ease by which it could be achieved, and the reason it did not occur sooner. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532.)

Whether a previously made order should be modified and whether a change would be in the minor's best interests are questions within the sound discretion of the juvenile court. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) The juvenile court's order will not be disturbed on appeal unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination. (*Ibid.*)

B.  Analysis

Mother contends that her reunification services should not have been terminated and she should have been given custody of the children. To support changed circumstances, Mother argues that she completed her child abuse program, participated in therapy, and cared for a newborn baby without Agency intervention. To support that the proposed modification would be in the children's best interests, Mother argues that her participation in services ameliorated the problems that gave rise to the children's need for Agency protection, and she has a strong bond with the children.

Based on our review of the record, the court did not abuse its discretion in finding that Mother's circumstances had not changed in a way that resolved the issues requiring removal of the children from her. The court indicated that Mother's completion of her child abuse class and participation in therapy showed she was in the process of changing, at best. Mother had not established that her mental health and emotional state had stabilized to the point where she could protect and parent the children under all circumstances. Notably, she had stopped therapy for several months preceding the

7

section 388 hearing, and her therapist did not have enough information to assess Mother's emotional stability or capability to raise three children on her own. The court considered the entire history of the case, including concerns regarding Mother's inability to cope with stressful events, which manifested in depression and isolation, and her past gravitation to Father who she outwardly acknowledged to be abusive and violent. There was evidence that Mother was continuing to communicate with Father in prison and was still in some kind of relationship with him despite her statements to the contrary. Father would be released from prison, and his problems remained untreated. Likewise, given the uncertainty of Mother's coping mechanisms, her care of one baby without Agency involvement did not show that Mother could safely parent *three* small children. Thus, the court did not err in finding that Mother had not demonstrated changed circumstances to reinstate reunification services.

In addition, the court did not abuse its discretion in finding that placing the children in Mother's custody would not be in their best interests. The physical abuse of one-month-old M.P. had been severe. Mother had not only failed to protect her baby, she had minimized Father's violent nature and believed him to be incapable of performing intentional acts of abuse. As we have explained, issues concerning Mother's emotional state and relationship with Father remained unresolved; thus, the problems leading to the children's dependency had not significantly ameliorated. Moreover, the court noted that although Mother had positive visits with the children, they did not consider her their primary caretaker. Instead, they routinely went to Relatives for comfort, bathing, and feeding, and Mother was not typically involved with the children's medical care or

8

education. She had not availed herself of the ample time and opportunities to take a greater role in the children's care. Finally, the court emphasized that the children had been living with Relatives for a protracted period of time—virtually all of M.P.'s life—and they primarily looked to Relatives as parents.

The juvenile court did not err in denying Mother's section 388 petition.

II

*The Juvenile Court Did Not Err in Declining to Apply the Beneficial Relationship Exception to Adoption*

A.    Applicable Law

At a section 366.26 permanency planning hearing, once the juvenile court finds by clear and convincing evidence that the child is likely to be adopted within a reasonable time, the court is required to terminate parental rights and select adoption as the permanent plan unless the parent shows that termination of parental rights would be detrimental to the child under one of several statutory exceptions. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.) One of these statutory exceptions is the beneficial relationship exception to adoption, which applies when it would be detrimental to the child to terminate parental rights in that "[t]he parents have maintained regular visitation and contact with the child and *the child would benefit from continuing the relationship*." (§ 366.26, subd. (c)(1)(B)(i), italics added.) The burden is on the party seeking to establish the beneficial relationship exception to produce evidence establishing the exception is applicable. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey J.*).)

9

We apply a substantial evidence standard of review to a juvenile court's findings on whether the requirements for the beneficial relationship exception have been established. (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 576 (*Autumn H*.).)[2]

B.     Analysis

The juvenile court found that Mother had maintained regular visitation and contact with the children. Thus, to show applicability of the beneficial relationship exception to adoption, Mother was required to establish she had a relationship with the children that they would benefit from continuing. Here, substantial evidence supports the trial court's finding that Mother did not establish the existence of such a relationship.

The statutory phrase "benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i)) refers to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional

2     As the Agency notes, a "hybrid" standard of review regarding the beneficial relationship exception has been used in some cases. In *In re J.C.* (2014) 226 Cal.App.4th 503, the court applied the substantial evidence standard of review to the factual issues of whether the parent maintained regular visitation and contact with the child and whether the parent proved he or she had a beneficial parental relationship with the child. However, as to the weighing test in which the juvenile court balances the strength of the parent-child relationship against the benefits the child would derive from adoption, the abuse of discretion test applied. (*Id.* at p. 531; see *Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.)

attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

To meet the burden of proof to establish a beneficial relationship, "the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits—the parent must show that he or she occupies a parental role in the life of the child." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527 (*I.W.*); see *In re Jason J.* (2009) 175 Cal.App.4th 922, 936-937; *In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) The evidence must establish more than merely "a loving and happy relationship" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419), and the parent must be more than " 'a friendly nonparent relative.' " (*Jason J.*, at p. 938.) "A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Here, although it was undisputed that Mother and the children had a loving relationship, substantial evidence supports the juvenile court's findings that it was not a beneficial parent-child relationship within the meaning of the statutory exception to adoption. The Agency reported that Mother generally had pleasant and positive visits with the children as well as displayed appropriate parenting skills. However, the children

11

were babies when they were taken into protective custody and had spent most of their lives in Relatives' home. The children were too young to understand the concept of a biological parent, and they considered Relatives' immediate family to be their own. Relatives directed the children's daily routine, including baths, meals, potty training, teeth brushing, and other activities, even on many nights that Mother was supposed to handle certain tasks. Relatives arranged the children's medical care and educational needs, i.e., Christian's speech therapy; Mother was largely uninvolved in those matters. When the children were hurt or sick, they looked to Relatives for comfort. The children generally separated easily from Mother, and their primary attachment was to Relatives.

Based on this evidence, the juvenile court reasonably could conclude that Mother did not establish that she "occupies a parental role in the [lives] of the [children]." (*I.W.*, *supra*, 180 Cal.App.4th at p. 1527.) Moreover, the court found that the children had done exceedingly well and thrived in a stable home such that any relationship between them and Mother was not outweighed by the security of a permanent placement. Finally, the court stated that any emotional attachment the children had to Mother would not be greatly harmed if parental rights were terminated.

We accordingly conclude that Mother has not successfully shown that substantial evidence does not support the juvenile court's determination that the beneficial relationship to adoption was inapplicable.

DISPOSITION

The judgment is affirmed.


HALLER, Acting P. J.

WE CONCUR:


McDONALD, J.


McINTYRE, J.

13